## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **UNION HOME MORTGAGE CORP.,** | **CASE NO. 1:20-CV-02690** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **JASON JENKINS, et al.,** | |
| **Defendants.** | **MEMORANDUM OF OPINION AND ORDER** |

This matter comes before the Court upon the Motion for Preliminary Injunction of Plaintiff Union Home Mortgage Corp. ("Union Home") against Defendant Joseph Della Torre ("Della Torre"). (Doc. Nos. 3, 4.)[1]  On March 15, 2021, after conducting limited discovery, Union Home filed a supplement in support of its Motion for Preliminary Injunction.  (Doc. No. 26.)  Della Torre filed a brief in opposition on March 29, 2021, to which Union Home replied on April 5, 2021.  (Doc. Nos. 32, 34.)  On May 5, 2021, the Court held a hearing on Union Home's Motion.  (Doc. No. 56.)  For the following reasons, Union Home's Motion for Preliminary Injunction (Doc. No. 3) is GRANTED IN PART and DENIED IN PART.

### I.  Background

#### a.  Factual Background

In 2004, Della Torre started working as a residential loan officer in the mortgage industry in southern Delaware, specifically the Rehoboth Beach area.  Generally, loan officers such as Della Torre generate business through referrals.  The bulk of loan officers' referrals usually come from real

---

[1] Union Home and Defendant Jason Jenkins reached an agreement as to the entry of an agreed injunction.  (Doc. No. 44.)

estate agents, but loan officers also may receive referrals from other sources, such as past clients and financial planners.  When serving as the loan officer for a client, it is important that the loan is processed in a timely manner and that the client has a good experience during the closing of the loan. Otherwise, the client and the realtor who may have referred the client are unlikely to refer future work to that loan officer.  (*See* Doc. No. 32-3 at 57:16-59:4.)

Typically, people use loan officers located in the area where they are purchasing property. (*See* Doc. No. 32-2 at 37:11-24.)  However, the Rehoboth Beach area in which Della Torre works is somewhat unique.  In Rehoboth Beach, most property purchases are vacation homes and investment properties, meaning the clients purchasing these properties usually do not live in the area, but are looking to buy a property for vacationing, to rent out, or both.  (Doc. No. 32-1 at ¶¶ 10-11.)  Because of this, loan officers in Rehoboth Beach often compete with lenders from buyers' hometowns who are not located in Rehoboth Beach.  According to Della Torre, this occurs about 60% of the time.

From 2004 to 2018, Della Torre worked for several different mortgage companies in the Rehoboth Beach area, including Delaware National Bank, Suntrust Bank, Fairway Mortgage, and Acopia.  (*Id.* at ¶ 5.)  During this time, Della Torre built a network of referral sources and loyal clients. (*Id.* at ¶ 9.)  Della Torre testified to having a very stable group of referral sources, most of which are real estate agents that he met in the years shortly after he started working as a loan officer in southern Delaware.  In addition to realtors, Della Torre has developed relationships with financial advisors, builders, insurance agents, and settlement attorneys that also refer business to him.

In February 2018, Della Torre left his position at Acopia to join Union Home as a loan officer and branch manager, bringing his network of referral sources with him.  Before Della Torre started working for Union Home, it did not have a branch office in Rehoboth Beach, and Della Torre was

recruited for the purpose of establishing a branch office there. (Doc. No. 26-4 at 76:4-77:8.) On February 28, 2018, Della Torre entered into an Employee Agreement with Union Home. (Doc. No. 1-2.) The Employee Agreement contained a non-compete covenant, a confidentiality covenant, a non-solicitation covenant, and a clause regarding the extension of these provisions in the event of a violation. Specifically, the Employee Agreement provides, in relevant part, as follows:

> 3. Employee agrees that he/she will not become employed in the same or similar capacity as he/she was employed with the Company by a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period of time between the date this Agreement is executed and ***EXPIRATION DATE February 28, 2019***; the "Restricted Area" shall mean a one hundred (100) mile radius from the Company's headquarters as well as any branch office of the Company to which Employee was assigned during the Restricted Period; and a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business. . . . Additionally, throughout both the Restricted Period as well as the Extended Period, Employee shall not employ or seek to employ any person who is employed by the Company or otherwise directly or indirectly induce such person or entity to leave his/her employment.

> 4. Employee shall not, except with prior written consent of the Company, (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party. When in tangible form, any and all Confidential Information shall be promptly returned to the Company at the request of the Company or upon separation of employment, whichever occurs first. For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets .of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's business, customers, customer files, suppliers, vendors, sales, marketing or finances. . . .

>> a. In the event Employee violates any covenant as set forth herein, the term of all covenants contained herein shall automatically be extended for a period of one (1) year after the later of (a) the date on which Employee ceases such violation; or (b) the date of the entry by a court of competent jurisdiction of any order or judgment enforcing such covenant, term or provision . . . .

3

>    b.  In the event Employee violates any covenant as set forth herein, Employee
>    agrees that such violation shall cause irreparable harm to Company and
>    Employee consents to the issuance of a restraining order and/or a preliminary
>    or permanent injunction by a court of competent jurisdiction. . . .

(Doc. No. 1-2 at 1-2.)  In February 2019, Della Torre and Union Home entered into an Employment

Agreement Extension Addendum, which extended the expiration date of the Employee Agreement,

including the non-competition provisions, to August 28, 2021.  (Doc. No. 1-3.)

Prior to joining Union Home, Della Torre informed Union Home's representative, Craig

Franczak ("Franczak"), that he was renting a desk at Coldwell Banker, a practice that is common

among loan officers as it helps solidify their realtor referral sources when they work in the same

office.  (Doc. No. 32-3 at 160:16-161:5.)  Franczak stated that the desk rental was not a problem and

that Union Home would cover the cost.  (*Id.*)  However, Union Home was unable to obtain the

appropriate license from the State of Delaware for the desk rental, which the State of Delaware viewed

as a separate branch of Union Home.  As a result, Della Torre ended up paying for the desk rental

himself.  (*Id.* at 161:10-166:7.)  He also personally paid for signage along the highway near the

location of his desk rental advertising Union Home and for certain marketing expenses.  (*Id.* at

169:25-171:19.)

During his employment with Union Home, Della Torre had access to Union Home's

confidential information.  For example, Della Torre had access to all of Union Home's customer

information that was stored on its system.  He also received daily "in-the-money" emails containing

information on Union Home's customers that could potentially benefit from a refinance.  In addition,

in order to apply for loans, customers and prospective customers sent Della Torre confidential

financial information and documents, such as their bank statements, W-2s, and tax and insurance

information.  Della Torre stored much of this information in a personal OneDrive account, which he

4

has used throughout his career, so that he would not have to ask customers for the same documents multiple times in the event the documents were lost by other employees at Union Home while processing the loan.  James Ferriter ("Ferriter"), Union Home's Senior Vice President, testified that Della Torre also had access to Union Home's confidential technology and security processes, profit and loss information, and marketing techniques, but provided no further elaboration regarding any of these topics.

Della Torre's employment with Union Home appears to have been relatively uneventful for about his first year there.  However, in April or May 2019, the loan processor that worked with Della Torre at Union Home was promoted.  According to Della Torre, after that, he was assigned to two different loan processors, neither of which were able to competently perform the job.  (Doc. No. 32-3 at 27:17-28:2.)  As a result, he could not get his loans processed in an accurate or timely manner, and he began missing settlement dates.  Della Torre communicated his concerns to Union Home and worked with Franczak, his Field Sales Manager, Michelle Cohen ("Cohen"), and others at Union Home to resolve the issues.  Della Torre testified that he even started having multiple calls a week with Franczak and Cohen, but that the processing problems were never fixed.  Instead, he was told there was no capacity from potentially more talented processors to take his volume of loans.

Despite these processing issues, Della Torre experienced a substantial increase in the volume of his mortgage origination from 2019 to 2020.  In just eleven months in 2020 before he resigned, Della Torre's volume increased 68% from $19,987,204 in all of 2019 to $33,718,507 in 2020.  (Doc. No. 26-6 at ¶ 6.)  In addition, Della Torre could not identify any loans that did not eventually close due to processing issues.

Della Torre testified that 2020 was a great year across the mortgage industry, but that this was due in large part to refinances, which are not sustainable.  Instead, Della Torre explained that relationships with referral sources are what sustain a loan officer's business, and that he was starting to lose business because of the problems with the processing of his loans.  Even though the loans may have eventually closed, Della Torre's referral sources became frustrated with the regular delays and other problems and stopped referring work to Della Torre.  For example, two long-time referral sources who Della Torre had met in the 1990s and 2006, respectively, stopped referring busines to him.  The processing issues also prevented Della Torre from gaining new referral sources while he worked at Union Home.  Indeed, deals with at least two new referral sources that Della Torre tried to add did not close on time, and he never received business from them again.  Della Torre testified that he did not add any regular referral sources while he was employed with Union Home.

Because of these continued processing problems, Della Torre eventually left his employment with Union Home.  In February 2020, CrossCountry Mortgage ("CrossCountry"), a direct competitor of Union Home, contacted Della Torre about working there.  Della Torre subsequently submitted an employment application with CrossCountry in September 2020, and accepted CrossCountry's offer of employment in October 2020, while still employed with Union Home.  On November 24, 2020, Della Torre then officially resigned from Union Home.  In an email to Ferriter and other Union Home employees, Della Torre explained that he was leaving because of the detrimental effects the processing issues were having on him, his team, his clients, and his referral sources.

Della Torre started working for CrossCountry the next day.  Initially, he was assigned to CrossCountry's branch in Newark, Delaware while CrossCountry waited for its Rehoboth Beach office to be licensed.  Della Torre now works for CrossCountry in the Rehoboth Beach area as a loan

6

officer and branch manager.  In fact, Della Torre works for CrossCountry in the same office in Rehoboth Beach in which he previously used to work for Union Home.  After resigning from Union Home, Della Torre retained his OneDrive account with information regarding Union Home's customers.  (Doc. No. 34-1 at 117:7-13.)  However, Della Torre testified that he has not given the OneDrive to CrossCountry or otherwise used the customer documents from the OneDrive to compete against Union Home.  One of Della Torre's loan officer assistants, Leana Tikiob ("Tikiob"), at Union Home also left Union Home and joined Della Torre at CrossCountry.  Although undated, Union Home presented evidence of an email found on Tikiob's email account addressed to Della Torre regarding her transition to CrossCountry and the terms of her new employment that appears to have been written around the time when Della Torre resigned from Union Home in November 2020.

At the time Della Torre left Union Home, he was Union Home's only loan officer in southern Delaware.  The closest branch to Rehoboth Beach that Union Home currently operates is in Newark, Delaware, which is approximately seventy-five to eighty miles away.  However, the loan officer in Union Home's Newark branch, Sheri Barber ("Barber"), is licensed throughout Delaware and not restricted to servicing a specific territory.  Union Home does not currently employ any loan officer in Rehoboth Beach, but is actively recruiting loan officers in Sussex County, which is the southern most county in Delaware and encompasses Rehoboth Beach.

### b.  Procedural History

On December 2, 2020, Union Home filed a Complaint against Della Torre and Jason Jenkins, another former Union Home loan officer.  (Doc. No. 1.)  With respect to Della Torre, Union Home set forth a single count based on his alleged breach of the covenant not to compete in his Employee Agreement.  (*Id.* at ¶¶ 65-73.)  Simultaneously with its Complaint, Union Home filed a Motion for

7

Preliminary Injunction, seeking to enjoin Della Torre from continuing his employment with CrossCountry in Rehoboth Beach in violation of the Employee Agreement.  (Doc. Nos. 3, 4.)  On December 31, 2020, Della Torre answered the Complaint and asserted counterclaims against Union Home for unjust enrichment and for a declaratory judgment as to the Employee Agreement's unenforceability based on Union Home's alleged violations of Housing and Urban Development ("HUD") regulations.  (Doc. No. 12.)

Subsequently, the Court granted the parties' requests to conduct limited expedited discovery with respect to Union Home's Motion for Preliminary Injunction and set a briefing schedule and date for a hearing.  On March 15, 2021, Union Home then filed a supplement in support of its Motion for Preliminary Injunction.  (Doc. No. 26.)  Della Torre filed a brief in opposition on March 29, 2021, to which Union Home replied on April 5, 2021.  (Doc. Nos. 32, 34.)  Finally, on May 5, 2021, the Court held a preliminary injunction hearing during which Della Torre and Ferriter testified and both parties introduced additional evidence.  (Doc. No. 56.)

## II.    Standard of Review

"In general, courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction."  *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 539-40 (6th Cir. 2017).  "These factors are not prerequisites, but are factors that are to be balanced against each other."  *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  However, "a finding that there is simply no likelihood of success on the merits is usually fatal."

*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  In addition, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. "The party seeking the injunction must establish its case by clear and convincing evidence." *Draudt v. Wooster City Sch. Dist. Bd. of Educ.*, 246 F. Supp. 2d 820, 825 (N.D. Ohio 2003).

**III.    Analysis**

**a.  Likelihood of Success on the Merits**

First, the Court considers whether Union Home "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

Union Home asserts that it has a strong likelihood of success with respect to its claim that Della Torre has violated the non-compete provisions of the Employee Agreement, as Della Torre is now working for a direct competitor in the very same market for which he worked for Union Home. (Doc. No. 4 at 7-9.)  In response, Della Torre does not dispute that he has violated the plain language of the Employee Agreement's non-compete provisions—which preclude him from working in a similar capacity for a competitor within 100 miles of his Rehoboth Beach office until August 28, 2021—by virtue of his employment with CrossCountry.  Instead, Della Torre asserts that the non-

9

compete covenant is unenforceable under Ohio law and that Union Home should be precluded from enforcing it based on its own wrongful actions.  (Doc. No. 32 at 8-15.)  Upon review, the Court concludes that Union Home is likely to succeed with respect to the partial enforcement of the Employee Agreement's covenant not to compete.

Before reaching the issue of whether the non-compete provisions of the Employee Agreement are enforceable under Ohio law, the Court will first address Della Torre's argument regarding Union Home's alleged breach of its implicit duty of good faith.  Specifically, although not addressed in its briefing, during the preliminary injunction hearing, Della Torre asserted that Union Home should be precluded from enforcing the Employee Agreement because it breached its implicit duty of good faith and fair dealing by failing to provide adequate back office services to enable Della Torre to close his mortgages.  The Court finds this argument unpersuasive, as the evidence shows that, at a minimum, Union Home made a good faith effort to work to close Della Torre's loans.  To wit, Della Torre could not identify a single loan that did not eventually close because of processing issues in the back office.  Further, Della Torre substantially increased his mortgage origination in 2020 and closed $33,718,507 worth of mortgages in just the first eleven months of the year.  (Doc. No. 26-6 at ¶ 6.)  And while Della Torre presented evidence regarding the numerous issues in processing that affected his work, he also stated that Union Home had multiple employees that worked with him to try to resolve the issues, albeit unsuccessfully.  Accordingly, to the extent that Della Torre's Employee Agreement contained an implicit duty of good faith on the part of Union Home to provide adequate loan closing services, there is no evidence that Union Home breached such a duty so as to justify precluding Union Home from enforcing the covenant not to compete against Della Torre.

As a result, the Court next will assess Della Torre's various arguments as to why the non-compete covenant is not enforceable under Ohio law.  In Ohio, courts will enforce non-compete agreements that are reasonable.  *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 270 (Ohio Ct. App. 1st Dist. 2000).  "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is [1.] no greater than is required for the protection of the employer, [2.] does not impose undue hardship on the employee, and [3.] is not injurious to the public."  *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (quoting *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 26 (1975)).[2]  "The party seeking to enforce the covenant 'is required to adduce clear and convincing evidence as to each of these factors' in order to prove that the covenant is reasonable."  *Id.* (quoting *Levine v. Beckman*, 548 N.E.2d 267, 270 (Ohio Ct. App. 10th Dist. 1988)).  However, non-compete agreements that are not reasonable still "will be enforced to the extent necessary to protect the employer's legitimate interests."  *Raimonde*, 42 Ohio St.2d at 25-26.  Indeed, "[c]ourts are empowered to modify or amend employment agreements to achieve such results."  *Id.* at 26.

In opposing Union Home's Motion for Preliminary Injunction, Della Torre makes several arguments as to why Union Home cannot show that the Employee Agreement's non-compete covenant satisfies the first factor noted above—that the non-compete agreement is no greater than is

---

[2] Additional considerations courts may assess when determining the reasonableness of a covenant not to compete include "whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment."  *Chicago Title*, 487 F.3d at 991-92 (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)).  In *Raimonde*, the Supreme Court of Ohio "compressed this lengthy list into the three factors quoted above."  *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 n.1 (6th Cir. 2002).

required for the protection of Union Home.  Specifically, Della Torre asserts that Union Home does not have a legitimate business interest to protect in Rehoboth Beach because it no longer competes in that area, that Union Home's selective use and enforcement of non-compete agreements demonstrate its real purpose in enforcing the agreement is to recoup its investment in and punish high performing employees, that Union Home has no legitimate interest in the goodwill established solely by Della Torre prior to his employment with Union Home when Union Home did nothing to help Della Torre continue to build that goodwill, that Union Home cannot claim an interest in protecting its confidential information because Della Torre has not improperly taken or used any such information, and that less restrictive means are sufficient to protect any legitimate interests that Union Home may possess.  (Doc. No. 32 at 9-15.)  Union Home specifically contests each of these points, and, in general, asserts that enforcement of Della Torre's non-compete agreement is necessary to protect Union Home's confidential information and goodwill with customers, prospective customers, and referral sources.  (Doc. No. 4 at 8-9; Doc. No. 34 at 3-11.)  The Court finds that the non-compete agreement is broader than necessary to protect Union Home's legitimate interests, but will enforce the agreement to the extent necessary to protect those interests.

In general, "[t]he purpose in allowing noncompetition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing *unfair* competition-not ordinary competition."  *Westco Grp., Inc. v. City Mattress*, No. 12619, 1985 WL 144712, at *3 (Ohio Ct. App. 2d Dist. Aug. 15, 1991).  Thus, "[i]f there is no legitimate interest of the employer to protect, then any non-competition agreement is not reasonable."  *Id.*  Employers' legitimate business interests include "limiting . . . a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client,"

12

"preventing a former employee from using his former employer's customer lists or contacts to solicit new customers," and "preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business." *UZ Engineered Products Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1068, 1080 (Ohio Ct. App. 10th Dist. 2001); *accord FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 528 (6th Cir. 2013) ("[A]n employer has a legitimate business interest in maintaining its ability to 'effectively compete' in the market and in protecting customer relationships.").

The Court finds that Della Torre's first argument regarding Union Home's lack of competition in the Rehoboth Beach area lacks merit.  "[A]n employer which abandons its business may not enforce a covenant not to compete," as it has abandoned its competitive interests.  *Premier Assoc., Ltd. v. Loper*, 778 N.E.2d 630, 637 (Ohio Ct. App. 2d Dist. 2002); *see also Premier Health Care Services, Inc. v. Schneiderman*, No. 18795, 2001 WL 1658167, at *6 (Ohio Ct. App. 2d Dist. Dec. 28, 2001) ("Appellants admitted that they do not have a legitimate business interest in preventing Physicians from working at MVH after the contract between MVH and Appellants was terminated.").  Relatedly, when the employer and former employee rarely compete for the same customers, the employer has less of an interest in enforcing a non-compete agreement.  *See Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 (6th Cir. 2002).

Here, in support of his argument that Union Home no longer has a competitive interest in the Rehoboth Beach market, Della Torre points out that at the time he resigned, he was the only Union Home loan officer working in Rehoboth Beach or in the southern part of Delaware in general, that Union Home has not hired another loan officer to cover the area, and that Union Home's closest

branch office is now more than eighty miles away in Newark, Delaware.  (Doc. No. 32 at 9-10.)  Further, Della Torre argues that the mortgage business is local in that it would be unlikely for a potential customer looking for a loan for a property to travel more than eighty miles to meet with a loan officer.  (*Id.* at 10.)

However, Della Torre's argument ignores substantial evidence that Union Home has not abandoned the Rehoboth Beach market and that Della Torre continues to compete with Union Home for the same customers.  To wit, while Union Home does not currently have a loan officer in the southern part of Delaware, it is actively recruiting loan officers in that area.  Moreover, Della Torre testified that the Rehoboth Beach market is a second home market in which the majority of the time he was competing with loan officers from outside the area, indicating Union Home's lack of a loan officer located in Rehoboth Beach does not necessarily prevent it from competing in the area.  Union Home also continues to maintain a branch office in Newark, Delaware with a loan officer, Barber, that is licensed throughout the state and not restricted to a particular territory.  Indeed, in the two years before Della Torre's resignation, Barber originated loans in all three counties in Delaware.  Likewise, prior to his resignation, although the bulk of the loans that Della Torre closed were in Sussex County where Rehoboth Beach is located, he also originated loans in all three counties in Delaware.  Thus, Union Home has shown that it continues to have a legitimate competitive interest in Rehoboth Beach and is competing for at least some of the same customers as Della Torre.

Della Torre's argument regarding Union Home's selective use and enforcement of non-compete agreements also is unpersuasive.  This same argument was addressed and rejected in another case involving Union Home and a different former employee.  In *Union Home Mortgage Corp. v. Payne*, the defendant employee also argued that Union Home's selective enforcement and desire to

14

recoup its investment in its employees, rather than the protection of its goodwill or confidential information, should preclude the enforcement of the non-compete covenant against her. No. 1:20 CV 26, 2020 WL 4282309, at *8-9 (N.D. Ohio Mar. 9, 2020). The court held that even "[a]ssuming plaintiff chose to selectively enforce its employment agreements, this did not relieve defendant of her responsibility to abide by her non-compete." *Id.* at *9. Further, the court opined that "the fact that plaintiff had a pecuniary interest in recouping its investment in its employees" did not "undermine its other legitimate interests, i.e., protecting its goodwill and confidential/proprietary information." *Id.*

Likewise, here, the fact that Union Home only adopts non-compete agreements beyond the first year of employment with certain loan officers and selectively enforces its non-compete agreements does not relieve Della Torre of his obligation to abide by the restrictions imposed by his Employee Agreement. Moreover, even if selective enforcement was a valid defense, Union Home has shown that it has credible business reasons for choosing to only enforce its non-compete agreements against certain employees. Ferriter testified that Union Home generally will not enforce its agreements against employees if there is no value to the goodwill they have generated, but that Union Home has never let an employee take its confidential information to compete against it. *See Petland, Inc. v. Hendrix*, No. 204CV224, 2004 WL 3406089, at *7 (S.D. Ohio Sept. 14, 2004) ("Any selective enforcement of the clause here is grounded in credible business reasons and does not serve to render the noncompetition clause invalid against Defendants."). Finally, even if part of the purpose behind Union Home's enforcement of its non-compete agreements is to recoup its investment in its employees, this does not undermine its other legitimate interests.

Thus, the Court disagrees with Della Torre's assertion that Union Home does not have any legitimate interests to be protected by the enforcement of the Employee Agreement's non-compete

covenant.  However, the Court does find that the covenant is greater than required to protect Union Home's interests and should be modified accordingly.

First, with respect to Union Home's confidential information, employers have legitimate business interests in preventing a former employee from using the former employer's customer lists or contacts to solicit new customers and in preventing a former employee from using the confidential information the former employee acquired during employment in a manner advantageous to a competitor.  *UZ Engineered*, 770 N.E.2d at 1080.  In cases involving confidential information regarding customers similar to that at issue here, courts have modified and limited the enforcement of non-compete provisions.  For example, in *Guardian Warranty Corp. v. Bulger*, the plaintiff sought to enforce non-compete agreements against two former employees.  No. 1:07CV235, 2007 WL 1362757, at *1 (S.D. Ohio May 8, 2007).  The agreements contained both a non-solicit clause regarding the plaintiff's customers and a non-compete clause prohibiting the defendants from working for a competitor within 100 miles of the defendants' sales territories for a year.  *Id.*  The plaintiff argued that an injunction enforcing the territorial restriction was necessary because while the defendants were employed with the plaintiff, the defendants regularly received confidential reports with customer profiles that would be beneficial to competitors.  *Id.* at *5.  However, the court held that a narrow customer-based restriction prohibiting the defendants from contacting customers whom they serviced while with the plaintiff was adequate to protect the plaintiff's interests, reasoning that the defendants "will have little use for any information they may have gleaned from Guardian's customer profiles if they are prohibited from soliciting sales from those customers for a period of one year."  *Id.*  Similarly, in *Brentlinger Enterprises v. Curran*, the court held that a limited prohibition on the defendant's use of confidential customer information was sufficient to protect the plaintiff's

business interests, and that a prohibition on any employment with competitors was not justified when the plaintiff failed to establish that the defendant had access to other proprietary information or trade secrets that would damage the plaintiff in the hands of a competitor.  752 N.E.2d 994, 1001-03 (Ohio Ct. App. 10th Dist. 2001).

In this case, Union Home has demonstrated that Della Torre had access to confidential information regarding Union Home's customers and prospective customers.  Specifically, Della Torre had access to Union Home's customer information that was stored on its system, received daily "in-the-money" emails containing information on Union Home's customers that could potentially benefit from a refinance, and received confidential information from customers when they applied for a loan.  In addition, not only did Della Torre have access to this information while he was employed by Union Home, he also stored documents he received from customers on a personal OneDrive account that he continued to use after his resignation and upon joining CrossCountry.  Although Della Torre claims that he has not used any of the information regarding Union Home customers on his OneDrive to compete with Union Home and that he accidentally deleted much of the information on his OneDrive during an attempt to produce it in discovery, Union Home still has a legitimate interest in ensuring that its confidential customer lists and information are not used by Della Torre to unfairly compete against it.  Therefore, enforcing the Employee Agreement's non-compete provision to prohibit Della Torre from soliciting or providing any services to customers or prospective customers he serviced while employed by Union Home or for which he received confidential information while employed by Union Home is necessary to adequately protect Union Home.

However, Union Home has not shown that precluding Della Torre from competing in the Rehoboth Beach area in any form is necessary to protect its interests in its confidential information.

17

In its briefing, Union Home asserts that in addition to confidential customer information, Della Torre also had access to trade secrets and confidential and proprietary information regarding Union Home's sales and marketing strategies, lending practices, referral sources, pricing, and risk tolerances.  (Doc. No. 4 at 2-3.)  But Union Home has presented little to no evidence in support of this assertion.  Rather, during the preliminary injunction hearing, Ferriter briefly noted that Della Torre had access to Union Home's confidential technology and security processes, profit and loss information, and marketing techniques.  Ferriter did not provide any further detail regarding any of these topics or explain how any of this information could be used by Della Torre to unfairly compete against Union Home.  As such, Union Home has not met its burden to demonstrate that enforcement of the non-compete would go no further than necessary to protects its legitimate interests with respect to its confidential information.  Instead, the Court finds that a narrower customer-based restriction is sufficient.

Union Home also contends that the reasonableness of its non-compete agreement is supported by its interests in protecting its goodwill with customers and referral sources, but the Court finds that enforcing the non-compete agreement to its full extent would extend beyond the goodwill to which Union Home has a legitimate interest.  As noted above, "[a]n employer has a legitimate interest in limiting the ability of employees to take advantage of personal relationships they develop *while representing the employer to the employer's established clients*."  *Ruhl v. J.E. Hanger Co.*, No. 92AP-280, 1992 WL 223738, at *3 (Ohio Ct. App. 10th Dist. Sept. 8, 1992) (emphasis added); *accord Down-Lite Int'l, Inc. v. Altbaier*, No. 1:19-CV-627, 2020 WL 950426, at *7 (S.D. Ohio Feb. 27, 2020) ("Another legitimate interest is protecting personal relationships with the company's customers that the employee developed when representing the company.").  Thus, even if an employee has extensive experience in an industry prior to working for a particular employer, that employer is entitled to

enforce a non-compete agreement to prevent the employee from taking advantage of relationships that were developed or strengthened as a result of his or her employment. *See Chicago Title*, 487 F.3d at 993 n.4 ("Magnuson had a wealth of experience in the title insurance industry prior to joining Chicago Title, which weighs against enforcement, but he also had ten years of employment with Chicago Title with which to strengthen his relationships with its customers, and this factor supports enforcement."); *Ak Steel Corp., v. Miskovich*, No. 1:14cv174, 2014 WL 11881029, at *12 (S.D. Ohio Apr. 17, 2014) (holding that although the defendant had seven years of experience in the steel automotive industry prior to his employment, "[t]he specific knowledge of and relationship with the customer developed while at AK Steel, as well as the knowledge of the processes and methodologies used by which AK Steel to service the specific customers, weigh[ed] in favor of enforcement of the non-compete covenant").

On the other hand, "when customers follow the employee, especially to a new employer, the former employer has less claim to a protectable interest in the customer's account." *Arthur J. Gallagher & Co. v. Anthony*, No. 16–CV–00284, 2016 WL 4523104, at *11 (N.D. Ohio Aug. 30, 2016). Accordingly, in *Anthony*, the court found that the employer, Gallagher, had shown little protectable interests in the business relationships of its employee, Anthony, when the evidence showed the following:

> Anthony did not start his insurance broker career with Gallagher. Gallagher gave Anthony no real training, did not introduce Anthony to preexisting Gallagher customers, and provided minimal direction.
>
> Instead, Anthony came to Gallagher with a book of business that benefitted little from the Gallagher relationship. No evidence showed that Anthony's clients came to him because of Gallagher.

*Id.*

Similarly, in *BDO Seidman v. Hirshberg*, the court found that the plaintiff, which was an accounting firm, had a legitimate interest in preventing the defendant employee's "competitive use of client relationships which [the plaintiff] enabled him to acquire through his performance of accounting services for the firm's clientele during the course of his employment." 712 N.E.2d 1220, 1224 (N.Y. 1999).  But the court held that "it would be unreasonable to extend the covenant to personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [the plaintiff] neither subsidized nor otherwise financially supported as part of a program of client development." *Id.* at 1225.  In support of this conclusion, the court reasoned:

> Because the goodwill of those clients was not acquired through the expenditure of [the plaintiff's] resources, the firm has no legitimate interest in preventing defendant from competing for their patronage.  Indeed, enforcement of the restrictive covenant as to defendant's personal clients would permit [the plaintiff] to appropriate goodwill created and maintained through defendant's efforts, essentially turning on its head the principal justification to uphold any employee agreement not to compete based on protection of customer or client relationships.

*Id.*[3]; *see also Am. Bldg. Serv., Inc. v. Cohen*, 603 N.E.2d 432, 435 (Ohio Ct. App. 12th Dist. 1992) ("The covenant, as written, seeks to stifle appellant's inherent skill and experience as a salesman for the cleaning service industry, bars his ability to support his family, and suppresses his talent in the cleaning industry even though his talent and knowledge about the industry were not actually developed during the short period of time that he was employed with Fiber Clean.").

In the instant matter, Union Home asserts the Employee Agreement's non-compete provision is reasonable because it is necessary to protect Union Home's goodwill with its customers and referral

---

[3] Although *BDO Seidman* is a New York case, New York applies the same three-part test as Ohio.  *See BDO Seidman*, 712 N.E.2d at 1223; *Unique Paving Materials Corp. v. Fargnoli*, No. 07 CV 2501, 2008 WL 11383295, at *7 (N.D. Ohio Oct. 31, 2008).

20

sources.  (Doc. No. 4 at 8; Doc. No. 26 at 5-7.)  However, with respect to referral sources, Union Home has failed to present evidence of any goodwill that Della Torre generated while at Union Home that was independent of the goodwill he had built during his time in Rehoboth Beach prior to his employment with Union Home.  In fact, the evidence tends to show that, if anything, Della Torre's time at Union Home damaged his reputation with his referral sources.  Della Torre worked as a loan officer in Rehoboth Beach for approximately thirteen years prior to joining Union Home and brought his referral network with him when he started Union Home's Rehoboth Beach branch.  Della Torre relied on these referral sources during his employment and did not receive any referrals from Union Home for the two years and nine months he worked there. (Doc. No. 32-1 at ¶ 13.)  Moreover, during his time at Union Home, Della Torre testified that he did not add any regular referral sources because of the constant processing issues.  Indeed, Della Torre specifically remembered getting first time referrals from two individuals that never referred anyone to him again as a result of processing issues that disrupted the loan closings.  Not only did he not add any new referral sources, Della Torre also testified that multiple long-time referral sources started to stop referring business to him.  Thus, Union Home has not shown by clear and convincing evidence that it has a legitimate interest in Della Torre's goodwill with his referral sources.  Rather, precluding Della Torre from continuing to work with referral sources he acquired prior to and independent of Union Home when those relationship were not strengthened, but harmed by, his employment with Union Home would be a broader restriction than necessary to protect Union Home's legitimate interests.  Thus, Union Home's argument related to its goodwill with referral sources is unpersuasive.

Union Home also cites its interests in its goodwill with customers in support of enforcing the covenant not to compete.  Della Torre testified that his customers would follow him wherever he

went. (Doc. No. 34-1 at 84:11-22.) He also closed hundreds of loans for customers while at Union Home. Even if some of these closings were disrupted by processing issues, Della Torre likely still established goodwill with numerous customers while employed with Union Home that he should not be able to take advantage of while at CrossCountry. However, to the extent that Union Home relies on the goodwill of its customers to support enforcement of the non-compete covenant, the Court finds that the customer-based restriction described above is adequate to protect Union Home's interests.[4]

In support of its request for injunctive relief, Union Home cites to two cases involving the same contractual provisions at issue here in which the court did not modify the scope of the non-compete, but both cases are distinguishable. First, in *Payne*, with respect to Union Home's interest in the protection of its confidential information, Union Home presented evidence that the defendant participated in Union Home's various proprietary programs and strategies, which provided the defendant access to Union Home's confidential information. 2020 WL 4282309, at *2. In finding that the non-compete agreement was no greater than necessary for Union Home's protection, the court specifically noted that the defendant "was exposed to plaintiff's confidential and proprietary information in the form of . . . meetings, programs, and strategies," and that "such 'information obtained during . . . employment' is a protectable legitimate business interest because an 'insider perspective into the policies and strategies of a successful company is very valuable to a competitor.'" *Id.* at *9 (citation omitted). In contrast, here, Union Home has not shown that Della Torre was exposed to the same type of confidential and proprietary information that would be valuable to a

---

[4] Union Home also contends that Della Torre's solicitation of his loan officer assistant, Tikiob, to join him at CrossCountry further supports a finding that Della Torre has attempted to capitalize on Union Home's customer goodwill by bringing with him a member of his team that also had customer contact. The Court finds that any additional potential misappropriation of customer goodwill resulting from Della Torre's alleged solicitation is adequately prevented by the customer-based restriction as well.

competitor. Instead, as noted above, the only testimony on the issue was Ferriter's brief mention of the fact that Della Torre had access to Union Home's technology and security processes, profit and loss statements, and the way in which Union Home markets to clients. It is unclear what specific information was encompassed by any of these subjects, whether Della Torre actually viewed any of this information, or what use it would be to him as a loan officer at CrossCountry. Moreover, with respect to goodwill with referral sources, the court in *Payne* found that Union Home had "presented evidence that defendant developed goodwill with new referral sources and enhanced goodwill with existing referral sources while employed with plaintiff." *Id.* at *10. Again, no such evidence was presented by Union Home in this case. Quite the opposite, Della Torre testified that he added no new referral sources and lost referral sources he had prior to joining Union Home.

Second, in *Union Home Mortg. Corp. v. Cromer*, the defendant was employed with Union Home for approximately fifteen years before leaving to work for a competitor in the same area. No. 4:21CV0385, 2021 WL 1601193, at *1-2 (N.D. Ohio Apr. 23, 2021). There was no indication that the defendant had worked as a loan officer in the area for any period of time prior to his employment with Union Home. Thus, the court did not address any argument regarding whether Union Home had a protectable interest in any goodwill with referral sources established prior to the defendant's work with Union Home. In contrast, Della Torre worked approximately thirteen years in Rehoboth Beach establishing goodwill with referral sources before working for Union Home.

Thus, the Court concludes that the non-compete provisions of Della Torre's Employee Agreement are unreasonable. Specifically, they fail to satisfy the first factor assessed by Ohio courts, as the prohibition on Della Torre working for a competitor within 100 miles of Rehoboth Beach until August 28, 2021 is broader than necessary to protect the legitimate business interests of Union Home.

23

As such, the Court finds the non-compete covenant of the Employee Agreement should be limited and enforced only to preclude Della Torre from soliciting or providing any services to customers or prospective customers he serviced while employed by Union Home or for which he received confidential information while employed by Union Home within 100 miles of Union Home's former Rehoboth Beach branch office until August 28, 2021.[5]

With respect to the second factor in determining the reasonableness of a non-compete agreement—whether the agreement would impose undue hardship on the employee—Della Torre argues that enforcement of the non-compete would impose an undue hardship on him because it would force him to move from Rehoboth Beach where he has lived and developed his referral network for many years and likely cause him to lose his referral network even if he stayed and waited out the remaining months of the non-compete. (Doc. No. 32 at 13-14.) Conversely, Union Home argues that the harm identified by Della Torre is typical of the enforcement of any non-compete agreement

---

[5] Della Torre has not specifically challenged the reasonableness of the temporal and geographic parameters of the non-compete agreement, and the Court finds them no greater than necessary to protect Union Home's interests. Courts have approved a 100-mile area as a reasonable restriction. *See, e.g.*, *Sheffield Metals Cleveland, LLC. v. Kevwitch*, No. 1:17 CV 1120, 2018 WL 1290990, at *9 (N.D. Ohio Mar. 13, 2018) ("[T]he 100 mile restriction is not unreasonable."). In addition, similar non-compete periods have been upheld as reasonable. *Id.* ("The agreement places a one year restriction on post-employment. Such a restriction has been found to be reasonable."). Union Home asserts that the restricted period should be extended to one year from the Court's order enforcing the non-compete covenant based on Paragraph 4(a) of Della Torre's Employee Agreement because Della Torre has violated the agreement by working for CrossCountry. (Doc. No. 26 at 14-15.) However, Union Home has not presented any evidence that Della Torre violated the modified version of the non-compete provision found to be reasonable by the Court. There is no evidence that Della Torre has attempted to work with any of his past clients at Union Home. Rather, he testified that prior to leaving Union Home, he did not solicit any customers to work with him at CrossCountry, that he has not used any information from his OneDrive to compete with Union Home, and that after he left Union Home, he would not return calls from any Union Home clients. As a result, extension of the non-compete period is not warranted. Any alleged violations of the Employee Agreement's confidentiality or non-solicitation covenants also do not appear to justify extending the non-compete period, as Union Home has not brought claims under either provision, and the Court's order is not enforcing those provisions. (*See* Doc. No. 1-2 at 2 ("In the event Employee *violates any covenant* as set forth herein, the term of all covenants contained herein shall automatically be extended for a period of one (1) year after the later of (a) the date on which Employee ceases such violation; or (b) the date of the entry by a court of competent jurisdiction of any order or judgment *enforcing such covenant*, term or provision . . . .") (emphasis added).) Nor has Union Home specifically argued that those additional alleged violations support an extension.

and insufficient to preclude enforcement, and that the agreement would not prevent Della Torre from working in several other states in which he is licensed.  (Doc. No. 34 at 8-9.)

The Court finds that, as modified, the non-compete agreement does not impose an undue hardship on Della Torre.  Ohio courts have recognized that "[a]ll non-compete agreements create some level of hardship."  *Penzone, Inc. v. Koster*, No. 07AP-569, 2008 WL 256547, at *4 (Ohio Ct. App. 10th Dist. Jan. 31, 2008).  Thus, "[a] determination that a covenant is unduly harsh requires a much greater standard than determining whether the covenant is merely unfair."  *Office Depot, Inc. v. Impact Office Products, LLC*, No. 1:09 CV 2791, 2011 WL 4833117, at *14 (N.D. Ohio Oct. 12, 2011) (quoting *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 706 N.E.2d 336, 343 (Ohio Ct. App. 10th Dist. 1997)).  Here, as modified, the Employee Agreement still allows Della Torre to compete in the Rehoboth Beach market and to utilize the referral sources he worked to build independent of Union Home, and only precludes him from working with Union Home customers in a way that would enable him to unfairly compete.  Such a restriction does not impose an undue hardship on Della Torre.

Finally, the third factor considered by courts when determining the reasonableness of a non-compete agreement is whether it would be injurious to the public.  The parties do not specifically address this factor.  Upon review, the Court finds that the non-compete agreement satisfies this factor and is not injurious to the public.  *See Payne*, 2020 WL 4282309, at *10.

As a result, the Court concludes that Union Home has shown a substantial likelihood of success with respect to a limited enforcement of the Employee Agreement's non-compete provision, which supports the issuance of a preliminary injunction to that extent.

### b.  Irreparable Injury

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction."  *Certified Restoration*, 511 F.3d at 550.  Union Home asserts that without a preliminary injunction, it will suffer irreparable injury from the loss of fair competition, the loss of its goodwill, and the misuse of its confidential information.  (Doc. No. 4 at 11-13; Doc. No. 34 at 11-13.)  In response, Della Torre argues that the harm to Union Home is speculative and that any harm that Union Home did incur could be adequately compensated by money damages.  (Doc. No. 32 at 16-17.)  The Court concludes that Union Home has established that a preliminary injunction is necessary to prevent irreparable harm.

A plaintiff's injury is considered "irreparable if it is not fully compensable by monetary damages."  *Overstreet*, 305 F.3d at 578.  "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate."  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  According to the Sixth Circuit, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."  *Id.* at 512.  In addition, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."  *Id.*; *accord Office Depot*, 2011 WL 4833117, at *12 ("In the context of non-competes, courts have consistently held that the 'loss of customer goodwill often amounts to irreparable harm because the damages are difficult to compute.'") (citation omitted).

In this case, without an injunction, Della Torre would be free to take advantage of Union Home's confidential information and the goodwill he established while at Union Home with his

former customers to compete with Union Home.  This would irreparably harm Union Home, as the resulting damages from the loss of Union Home's goodwill and the loss of fair competition from Della Torre's breach of his non-compete agreement would be difficult to calculate.  Thus, this factor also favors the issuance of an injunction.

### c.  Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others."  *Flight Options*, 863 F.3d at 540.  Union Home asserts that a preliminary injunction would not affect third parties and that it would only prevent Della Torre from benefitting through the improper use of Union Home's confidential information and goodwill.  (Doc. No. 4 at 13-14.)  In opposition, Della Torre argues that he would be harmed from having to either relocate outside the restricted area, wait out the remainder of the temporal restriction, or change careers.  (Doc. No. 32 at 17.)  He also contends that his referral sources and customers would be harmed from the inability to work with their chosen loan officer, particularly at a time when interest rates are becoming increasingly volatile.  (*Id.* at 17-18.)

The Court concludes that any incidental harm to others resulting from the preliminary injunction would be minimal and does not weigh against granting a preliminary injunction to the limited extent described above.  "In assessing a motion for a preliminary injunction, this Court must consider whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction." *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003).  Here, as noted above, the modified non-compete restrictions do not impose an undue burden on Della Torre and would allow him to continue to act as a loan officer in the Rehoboth Beach area.  In addition, the

customers that Della Torre is prohibited from working with will not be harmed, as there is no evidence that they will be unable to obtain mortgage services from other companies or loan officers. *See Payne*, 2020 WL 4282309, at *11 (rejecting argument that others would be harmed by an injunction where citizens in the restricted area would "still have ample access to competitive mortgages if defendant is bound to the agreement"). Accordingly, this factor weighs in favor of granting the preliminary injunction as well.

### d.  Public Interest

The fourth and final factor courts must consider when granting a preliminary injunction is "whether the public interest will be served by an injunction." *Flight Options*, 863 F.3d at 540. Union Home asserts that the public interest in preserving the sanctity of contractual relations and preventing unfair competition supports the issuance of a preliminary injunction, while Della Torre has not specifically addressed this factor. (Doc. No. 4 at 14.) The Court agrees with Union Home that enforcement of its non-compete agreement with Della Torre to the extent that it is reasonable under Ohio law is in the public interest. *See FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) ("The public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts.") (quoting *Nat'l Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996)); *see also Certified Restoration*, 511 F.3d. at 551 ("Enforcement of contractual duties is in the public interest.").

### e.  Unclean Hands

Finally, Della Torre argues that Union Home's request for injunctive relief is barred by its unclean hands. (Doc. No. 32 at 18-20.) Specifically, Della Torre asserts that Union Home violated HUD regulations by requiring Della Torre to pay for certain operating expenses for his branch

28

office—namely, his desk rental, the related advertising signage, and marketing expenses. (*Id.*)  In response, Union Home contends that Della Torre has not fully developed his unclean hands argument such that it should be considered waived and that the doctrine is inapplicable.  (Doc. No. 34 at 14-15.)  The Court finds that the doctrine of unclean is inapplicable to this case.

"The unclean hands doctrine generally provides that when a party takes the initiative to set in motion a judicial action in order to obtain some remedy, the court will deny the remedy where the party seeking it has acted in bad faith by his or her prior conduct." *Gardner v. Bisciotti*, No. 10AP–375, 2010 WL 4926575, at *4 (Ohio Ct. App. 10th Dist. Dec. 2, 2010).  "In order for the doctrine to bar a party's claims, that party must be found to be at fault both in relation to the other party and in relation to the transaction upon which the claims are based." *Id.*  In other words, "[t]he application of the unclean hands defense 'depends upon the connection between the complainant's iniquitous acts and the defendant's conduct which the complainant relies upon as establishing his cause of action.'" *Bonner Farms, Ltd. v. Fritz*, 355 F. App'x 10, 17 (6th Cir. 2009) (quoting *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 797 (6th Cir. 2009)).

Here, even if Union Home violated certain HUD regulations as alleged, such violations were not related to Della Torre's Employee Agreement.  The Employee Agreement does not mention Della Torre's desk rental, signage costs, marketing expenses, or HUD regulations.  Nor did Della Torre cite Union Home's alleged HUD violations as the reason for terminating his employment with Union Home when he resigned.  Accordingly, the doctrine of unclean hands does not preclude Union Home from enforcing the Employee Agreement.

### f.  Bond

Because all of the factors favor the issuance of a preliminary injunction to enforce the Employee Agreement's non-compete covenant as modified by the Court, and the doctrine of unclean hands does not preclude the contract's enforcement by Union Home, the Court will grant Union Home's Motion for Preliminary Injunction in part against Della Torre.[6]  Pursuant to Fed. R. Civ. P. 65(c), courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, Union Home has requested that it be required to post only a minimal bond (Doc. No. 4 at 14), while Della Torre argued at the hearing that a six-figure bond would be appropriate, although this assumed that Della Torre would be entirely precluded from working as a loan officer in the Rehoboth Beach area.  Given the narrower scope of the injunction, the Court concludes that a $5,000 bond is sufficient.  *Cf. Cromer*, 2021 WL 1601193, at *8 (requiring a $10,000 bond for the issuance of a preliminary injunction fully enforcing a similar non-compete agreement against a loan officer).

### IV.  Conclusion

For the reasons set forth above, Union Home's Motion for Preliminary Injunction (Doc. No. 3) is GRANTED IN PART and DENIED IN PART.  IT IS HEREBY ORDERED that:

a.  Della Torre is enjoined from soliciting or providing any services to customers or prospective customers he serviced while employed by Union Home or for which he

---

[6] Union Home also requested that the injunction issue against CrossCountry, but the Court finds it unnecessary to enjoin a non-party in this manner given the restrictions imposed on Della Torre.

received confidential information while employed by Union Home within 100 miles of Union Home's former Rehoboth Beach branch office until August 28, 2021.

b.  Within ten days of this Order, Union Home shall post a bond with this Court in the amount of Five Thousand Dollars and Zero Cents ($5,000).

**IT IS SO ORDERED.**


          *s/Pamela A. Barker*

          PAMELA A. BARKER

Date:  May 18, 2021          U. S. DISTRICT JUDGE